In fact, at the time of the invention, back in 1994, it was viewed as an unnatural act, something that was counterintuitive. If you cut up a baseball jersey, a basketball into tiny pieces, you wind up with scraps of unidentifiable material, unidentifiable scraps. Mr. Delva, let me ask you a question right off the bat, and by doing so I don't mean to suggest that only biotechnology or telecommunications and computers are going to be capital these days, but how do you think the Supreme Court that decided KSR would deal with a claim to a substrate like a card with a piece of memorabilia attached to it? How do you think that would fare in today's Supreme Court? I think it would fare quite well under the KSR standard. And the reason is, Your Honor, the Court emphasized whether there were unpredictable or unexpected benefits. At the time of the invention, there was a deep and long tradition, more than just a teaching, a deep and long tradition that memorabilia items were to be protected, that their physical composition was to be protected, that there was to be no damage to them. And this was for two critical reasons. One is that authenticity for a memorabilia item is critical to its value, critical to its existence. You must believe that it really is the actual item. In other words, you're saying the Marilyn Monroe card with a diamond attached, that's not authentic because it wasn't her diamond? It wasn't memorabilia, Your Honor. The issue is, to be memorabilia under the Court's claim construction, which hasn't been appealed and we agree with, it must be an item valued for its connection. What about the Beatles reference with the sheet that John Lennon slept on? The sheet that John Lennon slept on was memorabilia, Your Honor, but it didn't teach it's a good idea to cut up memorabilia and attach it to a trading card. In fact, it was done in 1964. Thirty years later, no one had tried that again. It was an experiment in that direction. Let's see what happens if we cut up a sheet that John Lennon slept on. Let's attach it to a piece of hotel stationery. See if people think it's good enough to have value and want to follow it. It didn't result in any followers. It wasn't a trading card either, I suppose you're telling me. It was not a trading card, and that's the key, Your Honor. That sheet of stationery didn't solve the problem of authenticity. No one believed it was authentic. No one believed that it had the real value that you want to do that again. So that experiment failed. A failed experiment doesn't teach you to keep going in that direction. It teaches the opposite. We shouldn't do that. No one predicted. No one expected. What's unexpected here? Commercial success? Well, the commercial success is unexpected, and the reason for the commercial success, which is that no one believed that when you cut up a whole memorabilia item, if I brought in here a Beirut jersey and a pair of scissors and said, let's cut it up into tiny scraps, would anybody think that was a good idea? Would anybody think that if I stuck it on a trading card before anybody tried it, that that would result in something more valuable? The Supreme Court, Your Honor, emphasized synergy. There was a tremendous synergy here. Instead of winding up with a thousand scraps of unidentifiable material and a trading card, we put them together and we wind up with trading cards. Memorabilia cards that have literally changed the industry. They drive all sales. It's necessary to competition in the industry. It is the primary predictor of whether a trading card product will fail or not is whether or not it has memorabilia cards in it. No one predicted that. No one expected that when you cut up a tiny scrap of material and put it on a trading card, that it will be perceived instantaneously as authentic. But indeed, they were. The objective factors, Your Honors, I think are as good as you'll find in any reporting case. It starts with a long-felt need. This priority has been around for literally decades. Every trading card manufacturer has an R&D department. They're looking for new products. They all have memorabilia items there. They all have scissors. Nobody said, let's cut one up and put it on a trading card. But where was the need? There were two needs, Your Honor. One is there was a need to be able to generate more authentic memorabilia and be able to distribute it widely, to have it authenticated easier. Authentication was an expensive process. And memorabilia at that point was getting priced so that the average family couldn't afford it. So there was a need to have a way to have memorabilia that could be affordable to the average family and could be distributed to the masses. There was no conceivable way to do that. This met that need. What about the Father Eckert card, a card the same size as the original trading cards? The Father Eckert card, Your Honor, is neither memorabilia nor is it a trading card. To be memorabilia, we have to have an item that before it's cut up has a connection. So this entire combination has never been done before this? Absolutely not. And the Court agreed. The Court granted our motion for summary judgment of no anticipation on any claim. The lower court agreed. No one had ever done this before. To prevail, they have to prove that this combination would have been done and would have been obvious. But all the factors point the opposite way. We look at the, again, the objective indicators. I mentioned long-felt need. How did the trading card industry, how did the memorabilia industry react when they saw it? Did they say, yeah, this is obviously a good idea? No, the record is. They were very skeptical. This won't work. This is a crazy idea. It's lunacy. One trading card company after was introduced to everybody by the inventor. Well, what's not to work? I mean, you put them together, they work. I mean, the only work is commercial success, right? Well, it's acceptance. It's not like you can't staple them or paste them together. No, it's not the physical work, Your Honor. That's not the invention. It's not a method of how to put two things together. It's the combination of these. And nobody expected that you would, by destroying a memorabilia item, actually create something that was equal or greater value, much greater value. So that's what wasn't expected, what wasn't going to work. After it had been introduced, I mentioned the commercial success, millions and millions of memorabilia cards, millions and millions of dollars in profits, and ultimately recognition by the industry. It was named as the most unique product of the century. I'm not aware of any case identifying an invention as the most unique in its field of the century. Which century? Of the 20th century, Your Honor, of the 20th century. You mean ahead of Penicillin? In its field. In its field. In its field. This was by the leading trading card publication, Beckett, who declared it the most unique product of the century. And it was recognized by the defendants themselves. They called it revolutionary. They described it as an unthinkable combination. In addition, Your Honor, I want to briefly touch on another issue, which is that the plaintiffs sought to introduce supplemental expert opinions. It's expert on infringement, and the court refused to allow that. And what this issue relates to, Your Honor, is expert reports were filed at a certain time. Later, the plaintiffs' experts had additional trading cards that they wanted to opine upon and submitted a supplemental opinion, and the court concluded that that should not be done. The standard here, Your Honor, is whether or not there would have been prejudice to the opposing party. And the evidence is undisputed that there would not have been prejudice to the opposing party to let these infringement opinions in. The absence of prejudice is two factors for an expert, as the case law describes. The first is whether there would have been the ability or time to take the deposition of the expert. The second is the ability to prepare rebuttal reports. The defendant, Upperdeck, agreed in writing that they didn't want to take the expert's opinion, even an expert's deposition, even after getting the supplemental reports. They had no questions to ask him. The Upperdeck also agreed that one month would be sufficient time to prepare rebuttal reports. At that point, they had four months to do it, so there was no prejudice. And they also agreed that when they filed their motion, that if there were continuance granted, that that would solve any prejudice. They said the issue here is not a matter of surprise, it's a question of time. Have you done a search to determine how often this court reverses a district court on procedural issues such as this? A search on issues involving abuse of discretion is extremely rare. And what it requires are unique facts where the facts underline it or are undisputed on the legal issue that matters. Here, the facts are undisputed. There was no circumstance under which you could... Why were you so late in discovering the new evidence that appeared in the expert report? Well, we described that in our brief, Your Honor, and the issue was that we were waiting for Upperdeck to produce to us documents. And they failed to do it, and the magistrate judge, in fact, scolded them and said they were trying to run out of the discovery clock. We got the documents late, particularly documents that pointed toward the value of these various trading card series. Now, we don't rely upon... But wasn't it available publicly, this information? We could go on our website and find out somewhere by doing research any card in the world. We can do that. There's no question about it. And that's why we don't say that, listen, there was substantial justification. What we say is there was no prejudice to the other side. In order to preclude these, the court would have had to rule that there was prejudice to the other side based upon facts. The facts are to the contrary. All right. Thank you, Your Honor. Thank you. Well, Mr. Borden, Mr. Kirsch, you've divided your time in half. Mr. Borden, I want to go on an entirely different area. Baseball fans will tell you these cards have been around since 1807. In 200 years, no one has put any memorabilia on them. No one has used a chase card idea. Why isn't that pretty revolutionary? Indeed, it's extolled as revolutionary by everybody in the business. Why doesn't that convince you? Well, Your Honor, Mr. Gluck didn't invent the chase card here. The evidence is... 200 years, nobody puts memorabilia on this thing. Somebody comes up with that idea and you don't acknowledge it? Well, they didn't have chase cards until 1909. Why the memorabilia? Stick with the claimed invention. 200 years isn't done. 200 years is a long time for something that's supposed to be obvious to not be done. If it's obvious, it should have been done in 1809, 1810 maybe, right? It's not done until 1980 what? It's done in 1994, he says that's when the invention was made. 1994, 190 years? But you have to look at the relevant circumstances here, Your Honor. In 1991, they started making... If it's obvious, it should happen rather routinely. I mean, if it's obvious, somebody will do it. There's certainly... In order for you to prove it's obvious, there has to be a motivation, commercial success, a lot of opportunity here. So somebody's obviously going to do it in 1810, 1811, right? Well, they didn't start doing it until there were chase cards where you actually were inserting single cards into the packs around 1991. Well, but if it's so obvious and so beneficial, I'll do it in 1960 at least so I can capitalize on the Roger Maris idea. I'll get one of his bats. He hits 61 home runs, I can find one of those bats, tear it up and make a lot of money. Well, that's what Whittier did. I mean, it wasn't a baseball card, it was an entertainment card. Was it memorabilia? It was memorabilia. It was a sheet that was actually slept on by one of the Beatles. It was the same idea... That's not a trading card, though, is the point. It's not a trading card. Nobody is... It's an entirely different industry. We're talking about this industry and this art and this field and how obvious it's going to be for somebody to jump on this idea and make a lot of money, but nobody did for 190 years. It is the same industry. It's making collectibles. It's distributing this memorabilia to a wide group of people. Why didn't anybody do it then repeatedly afterwards if it's such a good idea? Well, it wasn't... Why didn't they do it in the baseball card industry where you'd really make the money? Well, because in the baseball card industry, people weren't... Because it wasn't obvious. Because people were not using these insert cards until 1991. Within a couple of years, we came up with the idea. The fact is that the patentee said here that the problem that he was trying to solve was the high cost of memorabilia. Whittier fully solved that problem. That comes back to what he said. It certainly doesn't make much sense to me to slice up Roger Maris' bat. That thing's a vast value as a bat. Why am I going to slice it up into little pieces? Well, it's the same thing in Whittier. They sliced up a sheet that was left on by the Beatles. They destroyed any aura of authenticity that that sheet had for the same purpose of distributing lots of little pieces to many people to drive down the cost of the memorabilia and to enable the person who's making the card to... And once again, I come to you and say, if that was so obvious from the John Lennon sheet, why wasn't it done in the baseball industry? Well, it's the way the industry works itself. It's undisputed. Yeah, for 190 years they didn't do it. You're having a lot of trouble convincing me here. If you have a good answer to the 190 years, you've got me. But 190 years is hard to answer, isn't it? I don't think it's hard to answer because that's just not the way the industry was working. You didn't have these individual cards... So it wasn't obvious to do it. If nobody in the industry would have thought to do it, because whatever reason, the industry didn't work that way, you say, which isn't very legal argumentation, but... Well, this is a secondary consideration. I mean, this piece of prior art, Whittier, is within the field of endeavor. It teaches the solution to the very problem that the patentee was supposedly trying to solve, and it's sitting up there in the walls of his workshop. It's obvious to combine it with entertainment cards. Even taking that, why doesn't anybody do it for 30 years, then, in the baseball industry, where it's really valuable? They had no way to sell it. The minute someone did it, it was valuable. It was valuable because you were able to distribute it in random packs,  you would have to individually make these specific cards, just like Mr. Whittier did, just like people were doing when they first started making the insert cards. There was no way to map... Was there some factor that materialized in recent years that didn't exist in 1803? Pardon me, Your Honor? Did something happen, did something arise in more recent years that made it feasible, whereas it might not have been in 1803? Right, what made it feasible was the fact that they were making these individual insert cards, and inserting them into packs. There was a way to distribute and sell these things where there wasn't before. Nobody was going to sit and slice up a bunch of memorabilia and make it into cards. They had no way of selling it or making it commercially viable until the time that they were dropping these individual insert cards into the packs. You mean they didn't stack well? They weren't flat? They stacked well, but nobody had the idea of a chase card. Chase cards were something that developed in 1991. Mr. Gluck didn't invent the idea of chase cards. Chase cards started as autograph cards and hologram cards, a whole bunch of other different kinds of cards that they were using to try to get people to purchase the packs. But that was the invention of the chase card in 1991 is what enabled people to sell these memorabilia cards where they weren't going to do it before. All right, that's it from Mr. Kirsch. Thank you, Your Honor. Mr. Kirsch, can you explain the 190 years? Yes, I can, Your Honor. I'm glad you're asking that. Back when Ty Cobb was a child, people did not have this memorabilia fever that people have now. Back when Red Grange was playing football, people didn't think that, well, gee, if I wait outside the locker room and get a hold of his jersey, then I can sell it on eBay. Is that in the record somewhere? Nobody wanted Roger Maris's jersey? No one wanted Babe Ruth's jersey? Yes, in fact, in Media Tech's expert declaration, Mr. Taylor says that when people started... I think I can find an article of people striving to get Babe Ruth's cigars. They thought that his partially smoked cigars were very valuable. I remember a short story written to that effect. I have not read that, but I recall Media Tech's expert Ted Taylor remarking that a gentleman in Philadelphia acquired almost all of his collection merely by asking baseball players, can I have your jersey, can I have your baseball bat, can I have your glove? People did not associate value with these things, and so he acquired a multimillion-dollar collection for nothing, because he would simply approach a player after a game and say, can I have your jersey, can I have your glove, can I have that bat? What's your best reference? I think the best reference is the Whittier Hotel reference or the Marilyn Monroe reference. Mr. Kelly... Marilyn Monroe is not memorabilia, and the Whittier reference isn't a trading card. I understand that. However, if we look at Marilyn Monroe, the only difference between the Marilyn Monroe card and Claim 1, for example, is that Marilyn Monroe did not use, for example, the diamond on that card or did not own it. But that's not the definition of memorabilia that the district court... Is it also your point that we're not dealing with anticipation here but obviousness? Yes, I think that's right. I think the issue here is obviousness, not anticipation. Did the court consider the years involved? I'm not sure I understand your question. Did he consider that it took 190 years to come up with this? Or even if you want to date it from the 60s when the memorabilia fever hits a little harder, 30 years. Did he consider that? Yes, I think the district court did, because the district court had Mr. Taylor's declaration in front of it where Mr. Taylor said in great detail that these things simply weren't collectible and were obtained for free by this gentleman in Philadelphia, who later liquidated his collection for $2 million. That gets back to this whole notion of unexpected benefits. Mediatek says that this combination of trading cards and a piece of memorabilia had the unexpected result that consumers automatically accepted as authentic a piece of otherwise unidentifiable material. However, Mr. Taylor arrived at that conclusion without speaking to a single consumer, first and foremost. Secondly... They bought them, didn't they? Yes, they bought them, but he did not... That's kind of the ultimate test of authenticity, right? Whether you'll buy it or not? Well, but we don't know why people bought a package of cards. Maybe they're a football collector who favor Upper Decks cards. Maybe they want a signature card. Maybe there's a giveaway for Super Bowl tickets. This is a mixed motivational purchase, and we don't know. There's nothing in the record that indicates why any consumer would purchase a particular pack of cards, much less because of the claimed subject matter. That gets back to my second point, which is... If you look at the nub of this idea, Mr. Develle stands up. First thing he says is, No one thought of the idea of attaching a piece of memorabilia to a trading card. But let's get grounded here in what we're attempting to do. Determine whether the asserted claims are obvious. And if we get grounded and look at that, the 532 patent doesn't mention trading cards. None of the asserted claims... We're obvious. We're obvious at the time. We're not talking about today. Yes, that's right. We're obvious at the time. But none of the asserted claims of the 532 patent, so much as mention trading cards. So there can be no unexpected results or anything else with respect to secondary considerations for the 532 patent. Furthermore, if the idea here is to create this aura of authenticity, well then, why does claim one of the 501 say a certificate of authenticity? At its elemental value, really, what Mr. Develle is saying is that if I go to a flea market, and I see a big roof trading card, and it's got a piece of fabric attached to it with two-sided tape, that I'm going to accept it as gospel, that somehow or other, Babe Ruth owned that or used that or it's associated with him in some way. And of course we know that's not true. But there are dependent claims that do discuss baseball cards, jerseys, etc., right? Those are other claims, but those are not before the court, and they were not before the district court, and they're not before this court. But the claim in question is a memorabilia card, and in context it's pretty clear that's discussing this industry, right? No, the 532 patent does not say memorabilia card, Your Honor. Object to Develle. The 532 patent, for example, the asserted claims say an article of memorabilia. And the reexamination claim. Yes. For example, claim 23, the first asserted claim, says an article of memorabilia comprises, and the word trading card does not appear. In 501, it's memorabilia cards, the first three words, right? That's right. 501, yes. But the 501, it says certificate of authenticity. So if merely attaching a piece of memorabilia was sufficient to create authenticity, then why is there a certificate of authenticity required in the claim? And the only example shown in both of the patents is a baseball player with the bat, right? That's right. It's a little hard to get this out of context, isn't it? Yes, but the piece of baseball bat. And nobody's asserting it against anything except you, a baseball card person, right? Well, no, Your Honor. We sell more than just our playoff. Before we went out of business, we sold more than just baseball cards. But it's the baseball card business we're talking about here. No, because many of the claims, for example, in the 532, talk about a piece of a soccer ball, a piece of a hockey puck. There's a variety of different things that are involved here. But if you look at the disclosure of both patents, they talk about the item protruding from the card or the carrier. And that was not commercial. That could not be commercialized, rather. No one would accept a piece of material sticking out from the card because it simply could not be mass-produced. It could not be inserted into packs of cards without a consumer detecting it, and it could not be put into automatic sorting machines. It could not be put into carriers. Sounds like you're making a good non-obviousness argument. No, Your Honor. People aren't going to do that. No, what I'm saying is that the claims subject matter, what the inventors came up with here, the inventor singular, was something that could not be commercialized. And any commercial success has to be attributed to what the trading card companies did in coming up with a method to package the memorabilia card in such a way that it could be mass-produced. I recommend you get an improvement patent you can license from them, and I'm sure you'll do very well commercially. I understand your point, Your Honor. However, this is not about, if you look at their patent, this is not about trading cards, sold-in sets, and so forth. There's nothing in the patent itself that talks about selling trading cards as insert cards. All right. Thank you. Thank you. Your Honor, the innovation didn't arise because of something that occurred in 1991. Memorabilia had been collected for centuries, decades. It had been very strong. In 1975, our expert was the president of the sports card and sports memorabilia show where sports cards and memorabilia were put together and shown for the first time. No one ever thought of, let's cut up a piece of that memorabilia, cut up the memorabilia. But they did. You've still got to get around John Lennon's sheet, don't you? They did cut that up, and they did put it into some kind of form that might have led one to trade it even. In 1964, Your Honor, they put it on a piece of stationery, and it failed. The key to the invention is not the certificate of authenticity that's found on a trading card. There was a certificate of authenticity in that piece of stationery. The key to the invention is attaching it to a trading card where, as the record shows, a collector picks up the aura of authenticity from the trading card and automatically accepts that it applies to the piece of memorabilia. That is an opinion of our experts. It's explained in detail. It must be accepted for purposes of summary judgment, Your Honor, but that's the basis for the success of the memorabilia card. In addition, we all know about Cooperstown, not because it was invented in 1991, Your Honor. Memorabilia has been collected for decades. Let me turn to the 532 patent. Asserted claims do not relate to a card, Your Honor. They don't require a card. But the reason that they were not obvious is because they are very particular types of memorabilia. Baseballs, bats, jerseys, items that no one before ever considered cutting up because there was a strong and deep teaching in the field, do not physically damage memorabilia. Don't do it. How about a sheet? We don't have a separate claim on a sheet, Your Honor. There wasn't that strong teaching outside of the sports field. That's why... If it isn't a sheet, an article of memorabilia. If it's in the context of being slept on by the Beatles, yes it is. Which is why they only assert that as to the 501 patent, Your Honor, where it requires combining an item of memorabilia with a trading card. There was no teaching in any field that would have suggested that that's a good idea. They don't point to any reason to combine a cut-up piece of memorabilia with a trading card. I think it's a terrible idea, but maybe that supports your point. Exactly, Your Honor. Even when it was introduced, it was thought to be a terrible idea. Even when it was introduced, people were skeptical of it. And it was surprising that people found greater value in a scrap of unidentifiable material. When it was attached to a trading card, next to a picture of the player... When I was 10 years old, I brought home to my mother a trading card with Ted Williams on it, a little piece of his shirt on it, and she said, You'd better have it. My mother might have had the same reaction, Your Honor. But fortunately for all of us on this side of the table, there's a lot of money in this business, Your Honor. And it's all driven today by memorabilia cards. Mr. Gluck invented the word memorabilia card. He coined the term memorabilia card. And all the defendants use it to describe their products. Is there any further questions, Your Honor? No. Thank you. The case is submitted. This will be the Secretary of Veterans Affairs, Mr. Carpenter. May it please the Court, Kenneth Carpenter appearing on behalf of Mr. Jerry Douglas. Mr. Douglas appeals the decision of the United States Court of Appeals for Veterans Claims, which held that Mr. Douglas had not shown that his award of service connection was based upon the service department records that had been associated with his file. Mr. Douglas believes that that is a misinterpretation of the relevant regulation 38 CFR 3.156C. Not just a question of fact. Your application is not a fact. No, Your Honor. Because this question deals with the application of this regulation in every situation, not in this specific situation. In this specific situation, we believe that it applies, and it applies because of the VA's interpretation of its own regulation as published in June of 2005 prior to the issuance of the board decision in this case. Doesn't 156C require a new record that could have been discovered earlier? No, Your Honor. It requires a record that was not previously considered. In the VA's publication in 2005 at 70 Fed Reg 35 388 and 389, the VA gives an example that if the VA itself had in its possession records during the prior adjudication but did not associate the records with the claim before the final denial, then the evidence would still warrant reconsideration and retroactive evaluation of the disability. Now, that's precisely what was required in this case and what did not happen because the court below relied upon a misinterpretation of this regulation by suggesting that the award had to be on the basis of those records. Certainly, it contributed to the ultimate determination, but it didn't have to be the basis for the award of service connection. It simply had to be something within the service records. In 1983, when this matter was considered by the VA, the VA did not... What was missing from the record in 1983 that was available at that time? Well, I'm not sure it was missing, Your Honor, but what was not considered was that there was an... But it was there in the record. Well, it was in the service department records, yes. Now, what evidence do we have that it wasn't considered? The decision in 1983... In 1983, yes. And the decision in 1983 said that there was no medical evidence indicating any treatment for his back. That means that when they read these service medical records, they looked at these service medical records only for treatment. They didn't look at the service records to determine whether there had or had not been an injury. The predicate for entitlement to service connection is an injury that occurs. In 1998, the Board of Veterans' Appeals, when it both granted reopening and found entitlement to service connection, found that the service records did indeed indicate that there had been such an injury during service. As a consequence, the provisions of 3.156C were triggered, and he was entitled to the benefit of those regulations for a retroactive evaluation of whether or not he did or did not have a back disability at the time in which he filed his 1983 claim and then what the appropriate rating would have been until the time that he became service connected. I thought the service medical records showed an injury to the abdomen as a result of being caught between two tractors and that the back part of this didn't come up until later when one of his buddies testified that he had complained about back pain at the same time. Now, of course, I realize that these are factual matters that are not for our review, but they're in here and you're talking about them today. Well, and that is one of the problems in this case and in many of these cases with understanding exactly what it was that was in the record. There is no way of ascertaining specifically what was in the record and, for that matter, what the board relied upon. The board in 1998 was the one that indicated that there was evidence in the service records of the injury to the back. Now, obviously, they extrapolated something from those records that was not extrapolated that there was an injury but was nothing about the back that I recall. And I believe that that's Judge Mayer's point, and I'm simply saying that in 1998 what the board did was to extrapolate from that that there was an injury to the back. Now, this may have been in relationship to the other lay evidence that had been received, but that's precisely the point of 3.156C. This is a remedial beneficial regulation that says to the veteran, if we didn't properly consider your service records, even though we have them in our possession, and then we later reconsider them and award you the benefit, then you will be entitled to a reevaluation of your disability back to the date of the original claim. That's all this particular case is about and all the interpretation is about of how to interpret the VA's own regulation. The court did not defer to the VA's own interpretation of its regulation. Instead, the court below decided that it would read into the regulation something which doesn't exist, which is that the new evidence must be the basis for the award. That's not in the regulation. That's not part of the VA's own interpretation of its regulation. The court below relied upon a misinterpretation of this regulation. Unless there's any further questions, John, I believe I've covered all the points that I intended to cover. I'll reserve the balance if I need it for my rebuttal. But isn't the only reason he's granted service connection is because of the new evidence, the new submission, the doctor's note and his friend's delay statement? Absolutely, Your Honor. So that new evidence is what grants him the service connection, not something that was in the record and not acknowledged before. But, Your Honor, there is no requirement for that in the regulation. And if the VA explains its own regulation, it explains that it is the VA's receipt. Did we have them or did we get them? If we had them or we then got them and we hadn't considered them in the original decision, which they did not do, then the benefits of 3.156c become operative. Thank you very much, Your Honor. Ms. Farr?  May it please the Court. Mr. Douglas strongly advocates today for the Court to accept the VA's own interpretation of this regulation as reported in the Federal Register. And so I'm going to read directly from the VA's statement in the Federal Register. Specifically, quote, this exception, 3.156c, applies when VA receives official service department records that were unavailable at the time that VA previously decided a claim for benefits and those records leave VA to award a benefit that was not granted in the previous decision. So it does have to be those records? It does have to be, at least in part or in whole, those records that were previously unavailable. The Board and the Veterans Court found, as a matter of fact, that Mr. Douglas' award was based on his newly submitted evidence, his doctor's report, testimony of a colleague from the service, and his own testimony with his wife, and not upon service records that were first available after the VA's original decision. Mr. Douglas' challenge appears to be to the facts found by the Board. He suggests that the Board's 1998 finding must have depended either on new records or new consideration of records, but that flies directly in the face of the factual findings of the Board and of the Veterans Court. Of course, this Court does not have jurisdiction to revisit those factual findings. But as a matter of legal interpretation, I hear this morning Mr. Douglas urging the Court to accept the VA's own interpretation of its regulation and that interpretation, as I just read and quoted from the Federal Register, requires the award to have been based on new records that were not in the VA's possession at the time of its original decision. And the Board and the Veterans Court clearly found that is not what this award was based on. Unless there are any questions from the Court, I think we've covered this in our brief and argument this morning. Thank you, Your Honor. Thank you. Mr. Carpenter? I concede that in the public notice that the VA offers two apparently contradictory positions, the one that the VA just stood up and relied upon and the one that we have relied upon. In that case, Your Honor, the benefit of the doubt needs to be resolved in favor of the interpretation which most benefits the Veteran. This is a remedial regulation. It should be allowed to remediate. If there is a conflict, then that conflict needs to be resolved in favor of the Veteran. Thank you very much, Your Honor. All right. Case is submitted. This Court to uphold contempt on a patent injunction that TEVO reads as an unprecedented prohibition on non-infringing design rights. But that is not what the injunction says, and ECHO-STAR should not have been expected to read it that way. The phrase infringing products is most reasonably and naturally read to mean products that infringe. This was in order to disable the current infringing products in their current infringing form, not in order prohibiting ECHO-STAR. It doesn't say that. It says disable all storage to and playback from. Now, that sounds to me like you ought to have recognized that all means all and have appealed it earlier. Your Honor, it says- I'm asking the waiver question. Well, so let me first explain why it doesn't mean that, and then I'll turn to the waiver question. So, yes, TEVO makes that argument, and TEVO's argument is premised particularly on the notion that infringing products does not mean products that infringe, but rather the following eight model numbers. Now, we know that that can't possibly be what it means, and we can look at it together on page 162 of the injunction, of the joint appendix. The very next sentence uses the same exact formulation, so it's 162 right at the bottom. Now it's on the enablement point, and it reads, the DBR functionality, i.e., disable all storage and playback from a hard disk drive of television data, exactly the formulation Your Honor used, shall not be enabled in any new placements of the infringing products. Okay, so if TEVO's formulation of infringing products is correct, that must mean the DBR functionality shall not be enabled in any new placement of the following eight models, regardless of whether they infringe or not. So you're explaining why all doesn't mean all? Well, Your Honor, I'm explaining why TEVO's- But I'm saying, why didn't you just appeal it? Well, Your Honor, there was no reason for anyone reading this injunction to believe that infringing products meant anything other than the products that infringe, and in that sentence, all meant all of the infringing, excuse me, all of the functionality as it existed in the device at the time, not don't design around, which would have been a very unnatural reading, particularly because TEVO never requested any ban on design arounds in the context of this case. TEVO said that it was asking for, in order to prohibit infringement, nothing more, nothing less, actually citing two international rectifier. TEVO's current interpretation of the injunction would have required, TEVO's current interpretation would have been both unprecedented and unlawful. TEVO never suggested that there was a curse on the hardware, never sought a recall of either of these boxes, well, never sought a recall of these boxes, never offered this recall light theory that the later, the power to do the lesser included the power to do the greater, and the district court said nothing about any of these notions. So then turning to, finally, Your Honor, the question of waiver, because there was no reason for a reasonable litigant in Echo Star's position to have imagined that the district court was ordering something that TEVO never requested, and certainly it wasn't at all clear, and it would have been illegal, there was no reason to appeal it. And I can imagine the conversation Mr. Dunner would have had with this court at the time. He would have come before the court with all of the issues in front of the court on a very complicated case and said, Your Honors, this injunction is too broad because it illegally prohibits non-infringing conduct. And this court would have said, well, Mr. Dunner, has anyone interpreted it that way? Has anyone asked for it? And he could have said DVR functionality is defined in here, and all means all. Please make sure there's no ambiguity, Court of Appeals. And we could have done so with a stroke of the pen. And said infringing is all you can enjoin, of course. And my point, Your Honor, is it would have been unnatural for him to be doing that, and especially with all the other issues, to stretch to find a meaning for this injunction that no one had proposed. Turning to the infringement provision for a minute, don't you really have to reverse your theories entirely from what you were before to when? Your Honor, on one particular aspect of it, both Thiebaud and Equestar have switched positions.  We have switched positions, Your Honor, and for good reason. We had a jury verdict against us that told us we lost on that argument. And there's something very unfair in the district court's opinion in saying that we are bound by our losing position, and Thiebaud is not at all bound by its winning position. In any event, the court said those positions dealt with hardware, and we're now dealing with software. Isn't that correct? That is what the court said, Your Honor. But no one made the argument that the word parsing meant something different in the two claims. In fact, both Thiebaud and Equestar took the position that this is one invention. The words mean the same thing in both. In fact, the construction was the same in both. Now, just to back up then, Thiebaud does not contest that those features are now gone. In our briefs, we posed a challenge to Thiebaud, multiple challenges. How in the world can you claim that the redesign was essentially the same when you now have to turn to different features, invoke different theories, and prove different facts in order to prove infringement? How can you say that there are no open questions of infringement, which is to say all questions of infringement were already adjudicated against Equestar if you have to present dueling experts to argue about what… But parsing means analyzing, and that's very broad, but it wasn't appealed. We did not appeal the construction. We're accepting the construction, and I'd like to do it with you, Your Honor. Yes, and now this happens very often here. You accept the construction, and then you argue about the construction of the construction. No, Your Honor, we're not. Parsing, Your Honor, does not mean… Parsing means analyzing. Parsing video and audio data under the construction of the court means parsing video and audio data, and the mistake that the district court made was forgetting that what's supposed to be parsed is video and audio data. But again, this is an open question of infringement. Now, we're now talking about a totally different feature from the Stark Code detection, which Thiebaud had claimed in the original action performed the parsing. And I hasten to add, when we talk about open questions of infringement, the question you, Your Honor, Judge Rader, asked at the outset is quite relevant. Thiebaud is now having to switch positions on what it is identifying as the parser, which means that that question couldn't possibly have been adjudicated against Echostar in the first proceeding. Thiebaud also can't call the redesign a subterfuge when Echostar managed to achieve two results that Thiebaud's own inventor said were impossible to achieve if those two features were gone, and a highly reputable and independent patent firm confirmed to Echostar not only that these products are more than colorably different, but that they were different enough to defeat an infringement claim on five separate theories. So on pages 28 to 29 of our blue brief, we list nine reasons why these devices are not essentially the same. Thiebaud mainly says that all of those are irrelevant, but does not really engage on them. Our main point on colorable differences, Your Honors, is that Thiebaud's, excuse me, that the district court made numerous legal errors. I know Thiebaud was saying this is about deference and clear and convincing, excuse me, a clearly erroneous standard, but that is true as to facts. But here we've got legal errors. Let me just, with my time remaining before my rebuttal time, mention one of them. The district court mistakenly concluded that removing a feature does not implicate claim terms, just because the name that Echostar used for that feature does not appear in the claims. Well, that's, of course, wrong. These features, star code detection, indexing, blocking, were implicating the claim terms. They were the basis on which Echostar had been found to have infringed in the first place. If they didn't implicate claim terms, there could have been no finding of infringement. If there are no further questions, I'd like to reserve the remainder of my time for a while. Thank you, Your Honors. Mr. Lechner. If they please the court. The trial judge who presided over this case for well over five years has written a careful, detailed opinion, finding Echostar in contempt of two independent provisions of the injunction. But he could not have ever enjoined anything other than infringing conduct, could he? He has the authority under 283, and I'm quoting the statute, to issue an injunction in accordance with principles of equity to prevent violation not of any patent, but violation of any right secured by a patent on such terms as the court deems reasonable. And this court has on occasion, and we're talking here about whether the court abused his discretion in concluding that with this infringer. But is anyone ever going to interpret that all to be anything other than all conduct that was infringing? Not dismantling the machine. Judge Rader, that is, first of all, the request was not for dismantling the machine. The request was, as your questions pointed out, to disable all DVR functionality with respect to satellite receivers. The sum of the functionality is not infringing.  The court had found infringement both of the so-called hardware claims, claims 1 and 32 that dealt with the media switch, and the software claims that are issued here. We made a request to the court that in our proposed injunction, which is on page 7550 of the joint appendix, both with respect to products that are already in subscribers' homes that Echostar leases to them, that there be a disablement of the software that, or of the functionality that provides DVR functionality. This is a company that provides principally satellite reception service. We asked for that. We also asked with respect to boxes that are in inventory in warehouses, et cetera, et cetera, that they be destroyed. Now, there was no question whatsoever that the judge understood what we were asking for. He provided what we were required, and although it is not relevant under the Supreme Court's decision in Travelers, Echostar darn well understood what we were requesting. It actually put in its 10Q, which Echostar has included in the joint appendix, language that says we've just lost a trial, we're going to have to litigate the scope of the injunction, and Thiebaud is requesting that we disable all DVR functionality in the machines that we've placed. But I see nothing that makes it clear that you have to make a hardware fix, go in and literally remove hardware, when all of the infringing conduct could have been taken care of with a software beam down. Exactly the point. And we actually said in our briefs in front of the district court that we were going to- Can you tell me where you actually said they're going to have to remove the hardware? We never said we were going to have to remove the hardware. We asked for a removal of the infringing DVR functionality, which is accomplished by software, and we said, and Judge, it's at page- In our opening request, in support of the injunction that we requested, we said at page 6063 and 6064 of the joint appendix, 6063 is where we talk about existing placements. 6064, we said, EchoStar can disable the infringing DVR functionality in all DVR units by updating their software via satellite transmission. Now, the question you've asked, Judge Rader, about when this court has ever done such a thing or approved such a thing, you did it in spindle fabric, where you approved an injunction that extended not just to infringing- I think it was wool spinning products- but all in light of the particular facts of that case. You approved it in footnote 31 of Judge Lurie's decision for the court in Johns Hopkins v. SELPRO with respect to files of stem cell material that had been created before the patent had issued, had never been shown to infringe, but as you explained, in light of other conduct of the defendant in this case, the trial court was within its discretion to order the destruction of that material. Now, I concede that this is an unusual provision that is tailored to the very unusual facts of this case, and there was a time and a place to seek modification, to seek clarification, to appeal, and Echo Star made a deliberate tactical decision to do none of those things. When it came to this court to seek a stay of the injunction that Judge Folsom issued the first time, it filed emergency stay papers in this court that was all about, this injunction is going to make us stop using DVR functionality, it's going to cost us more than $90 million a month, we need a stay of the injunction, and when it filed its merits brief in this case, not a single one of the 14,000 words was addressed to the scope of the injunction. And other travelers, which after all the Supreme Court dealt with a provision that went to the subject matter jurisdiction of the court, the Supreme Court said, Mr. Waxman, I think we've got that point. Okay. I'm reading from the place you put me. Echo Star can reprogram and disable the infringing DVR functionality in all units by updating their software via satellite transmission. Correct. Now that was in support of an injunctive provision, if I can just direct your attention while you have it. How does that require a hardware alteration? It doesn't. We weren't asking for a hardware alteration. We were asking for, and you can see exactly, Judge Rader, what we were asking for at page 7550 of the Joint Appendix, paragraph 6, which requested, maybe I'll wait until you get your pages, so we don't actually have to read back and forth to each other. Go ahead. Let me make the following point with respect. Under Travelers, it is too late, far too late, for a collateral challenge to the scope, application, or interpretation of this provision. Under Travelers, it is also entirely irrelevant what all of these briefs and oral arguments said about this at the time. In Travelers, the parties came to the Supreme Court and said, look, there is substantial evidence that no one understood this order to apply to Travelers' own primary conduct. And Justice Souter, writing for the court, said, that looks right. You may well be right about that. But the time to raise those claims is over. The language of the injunctive order is plain enough that if there were an issue, this should have been raised before. And this is a paradigmatic example. Now, Mr. Rosencrantz says, well, maybe all doesn't mean all, and maybe the doesn't mean the, and maybe the defined term, infringing products, doesn't somehow mean the defined term. But the question, even if this were undirected, the question certainly now is whether or not they can seriously contend that no one could have read the terms of this injunction to mean what it plainly does mean. That is, that there was no possibility they could ever have imagined that they would be asked to do exactly what we asked the court to direct that they do on page 7550. Now, if I may, I don't want to cut off questions on the disablement provision, but I would like to talk about the infringement positions as well. You have to flip your position here too, don't you? Not at all. The issue at trial, the overwhelming issue at trial, dealt with the media switch in claim one. Claim one requires that the device have a media switch that parses and separates the audio and video streams. There was an immense, titanic battle about this because, and this was an issue on page 24. But the PDI filter only analyzes header data, not audio and video. May I first answer the question about whether we had to switch positions? I'm jumping in ahead. I want to make sure that I'm totally responsive here, but let me just say, again, the district court made a finding of fact that the PID filters, A, haven't changed from then to now, and B, they do analyze video and audio data from said broadcast data. That finding, I'm going to explain to you why it's correct. It is surely not clearly erroneous. When every single expert at the trial conceded that, either proclaimed it or conceded it. Now, with respect to, again, I think we need to put in context the point that Judge Luria was making. The main feature of the first trial, the overwhelming feature of their so-called Herculean workaround and their lawyer's letters and their thousands of hours of time dealt with this media switch. We created something that I called the genius of the invention when I was arguing before this court before, and that was a system in which the media switch would create a logical index of start codes, and that would go into the hard drive along with the actual data and assist a low-cost consumer DVR. You were trying to avoid the PDI filter prior arc, right? No, not at all. I mean, there was the PID filters, the PID filters as I gather they call them in the industry, are ubiquitous. They have been around forever. They are what allows someone to, a device, to take a multi-stream MPEG-2 transport stream that includes up to a dozen channels and lots of other information including software, and say, hey, the user wants to watch I Love Lucy on Channel 5 at 2 o'clock. What the PID filter does, and there's no dispute about this, like most electronics. There's no dispute about what the software and the hardware does. The entire multi-program MPEG transport stream goes through the PID filters, and the PID filters pick out from the entire flow of broadcast data, they pick out the audio and video segments that are associated with I Love Lucy at 5 o'clock on Channel 5, and then send them otherwise. The question was, do we have a media switch that parses and separates under the meaning of claim one? We said we do. We build this logical index that separates the two logically, and it's created by using a start code detector which looks at the segments that the PID filters identify and finds the start code for each independent frame. The header. Yes, they set up. Not the video and audio data. I mean, it's all video and audio. Each MPEG segment is 188 bits long. It includes, sort of like genes do, it includes little codes that are associated with a particular pixel. It includes start codes. It includes the PID. The filter looks through the entire data stream, identifies those pieces of audio and video segments that are associated with I Love Lucy. But it's all scrambled before it hits the PID filter. It is. Some of it is scrambled and some of it isn't scrambled. There are some scrambled channels and some unscrambled channels. The audio and video data is clearly scrambled before it hits the PID filter. It is not. There are some programs in which there is some part of the MPEG segment that's scrambled and some parts that aren't. But the point is that surely Judge Folsom was not clearly erroneous in concluding that the PID filters did exactly what every single one of their experts said. I mean, if the PID filters do not analyze broadcast data as the claim requires, I don't know how Dr. Johnson and Dr. Ryan and Dr. Polish, their experts, could have sworn under oath that they met the limitation of the parsing function. But it doesn't say broadcast data. It says audio and video data. And that's scrambled before it hits the PID filter. First of all, it says parses. We're talking about claim 31 here. Parses video and audio data from said broadcast data. The entire multi-stream MPEG transport goes through the PID filter. And the PID filter's job is to identify those audio and video segments that are associated with a particular program. Everyone agreed that that is parsing. The dispute at trial was that it doesn't involve separating an audio and video stream. The start code detector and the index did that. The jury did conclude that their devices, because they did build this logical index, did infringe. You reversed on the ground that separated, which is the claim term that was at issue, actually required physical separation and not logical separation. And the law to be applied before this court and before the district court on remand was the claims as construed by the court. How do we know what the jury found? There's no way to know what the jury found except that we were right. But the question is, under KSM, both Step 1 and Step 2, the question is whether or not there is a substantial open question of infringement in light of the claims as construed by the court. And in this instance, there are two claim elements. They were both construed. They were not appealed. And the judge was not only not clearly erroneous, he was clearly correct in concluding that they are still met under his plaintive structures. Thank you. I see my light is on. Thank you. Mr. Rosengrant? Yes, Your Honor. Just a few brief points. First, on the disablement provision. Back in 2006, there was no reason at all for a judge to say to Echo Star, you are a recidivist. You need to be disciplined in a particular way, which is what the spindle fabric case that Mr. Waxman talks about says. There was no reason back then for the district court to exceed the boundaries of the Patent Act, which says, 283 says, that this is for preventing infringement. Secondly, back in 2006, Thiebaud never said we need to ensure that Echo Star never designs around with respect to any devices and certainly did not say that with respect to the devices that were at home. Third, the test isn't whether someone could have squinted and imagined that this is what the injunction means. The question is whether the injunction is clear. And if Thiebaud has to have two different meanings for the words infringing products, depending upon where they show up in the injunction, it can't possibly claim that its reading is clear. Next, Thiebaud's whole theory for why the Disablement Clause should be read that way is both based on a misreading of the law and a misreading of the context. It is plainly illegal for the district court to order an injunction that exceeds the scope, even under the Patent Act, even under the theory that Thiebaud articulates. Thiebaud's theory is premised on the need to compensate for past harm in 283 and Johns Hopkins, which Thiebaud just cited, says exactly the opposite. And I'll read from Johns Hopkins. An injunction is not to, quote, fashion a meaningful remedy for past infringement, end quote, or to prevent a party, quote, from unfairly capitalizing on its infringement, end quote. Finally, Thiebaud is just wrong when it says that all of the experts, now moving to the Infringement Clause, that all of the experts agreed that the pit filter was the parser. Thiebaud's own expert absolutely said the exact opposite. And I'll read to the court from the very page that Thiebaud cites. This is Dr. Storer, Thiebaud's expert, who on cross-examination by Echo Star said, yes, parsing is a type of, excuse me, the pit filter does a type of parsing. And then on redirect, counsel says, you were asked some questions about a pit filter by opposing counsel. Do you remember that? I do. Were you given an opportunity to explain it? I'm sorry, this is on page 3542 of the record. Well, you could tell I was a little bit frustrated with the yes or no format. So no, I wasn't. Then on the next page he says, and so inside the receiver card, the input section, yes, there's a little bit of what you might call separation in order to perform this translation, a little bit of what you might call even a type of parsing in order to pick out the correct packets. But, this is the key, just because these are words you use to describe this conversion process, you shouldn't confuse that with the claim terms, which, by the way, is exactly what the district court judge did in his colorable differences analysis. He stopped at the notion of parsing, and Judge Rader, absolutely right, you can't stop there. The question is not does this analyze something, it's does it analyze video and audio data. If there are no further questions, I thank the court for its attention, and we respectfully request that the court vacate the injunction as to both provisions. Thank you, Your Honor. Thank you. Case is submitted.